IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,  )  <br>                                                     )  <br>            Plaintiff,             )  <br>                                                     )  <br>    vs.                                          )  <br>                                                     )  <br>MARLON WHITE EYES,            )  <br>                                                     )  <br>            Defendant.          )  | Case No. 8:07CR180  <br><br>REPORT AND  <br>RECOMMENDATION |

This case is before the court on the defendant Marlon White Eyes' Motion to Suppress Evidence (#25). Hearing was held on September 12, 2007. Douglas R. Semisch, Assistant United States Attorney, represented the government and Shannon P. O'Connor, Assistant Federal Public Defender, represented the defendant. The Transcript of the hearing (#39) was filed on September 28, 2007, and the matter was deemed submitted.

White Eyes moves the court for the suppression of statements made to law enforcement officers on April 26, 2007 and May 1, 2007, specifically alleging that he did not receive proper warnings or make knowing and voluntary waivers of his rights under *Miranda v. Arizona*, 284 U.S. 436 (1966), and that his statements were not freely and voluntarily given, as required by the Fifth and Sixth Amendments to the United States Constitution.

## FACTUAL BACKGROUND

Phillip E. Kratz testified that he is a victim specialist employed by the Federal Bureau of Investigation in Sioux City, Iowa. Kratz acts as a liaison with victims of federal

crimes, advises them of their rights, and answers questions about social service needs. On April 26, 2007 he responded to Mercy Medical Center in Sioux City, Iowa, where he met FBI Agent Bradley Purscell and Investigator Bentley Graybear of the Bureau of Indian Affairs. He was advised a baby, Mackennzie Smidt, was at the hospital in surgery, and that the baby's family was present at the hospital (6:20-24). Kratz believed the family of the baby included the Smidts (the family of the baby's mother) and the White Eyes (the family of the baby's father, i.e., defendant Marlon White Eyes) (7:23-8:6).

Agent Purscell advised Kratz that he was going to interview anyone who might have knowledge about what happened, and to try to establish a time line as to who was with the baby when the injuries occurred (8:7-12). Purscell first interviewed Lois Smidt, the baby's grandmother.

Kratz testified the interview with Lois Smidt lasted about one-half hour and that he was involved only intermittently because he was working on another case and kept getting calls on his cell phone (9:12-10:6). After the Lois Smidt interview, Justine Smidt, the baby's mother, was interviewed for approximately one hour (10:9-11:4). After the Justine Smidt interview, Purscell and Kratz went to the intensive care waiting room where they met the defendant, Marlon White Eyes. They told White Eyes they were conducting an investigation into the injuries to the baby, Mackennzie Smidt, and were talking to anyone who may have been involved or had knowledge of what had happened. Kratz observed White Eyes showed concern about the baby and was very cooperative. After being asked if he would speak with the officers, White Eyes agreed (12:3-9).

Kratz testified White Eyes was interviewed in an 8 x 12 room where Purscell, Kratz, and White Eyes were all seated. After identifying himself as FBI, Agent Purscell began the interview by telling White Eyes that Lois and Justine Smidt had been interviewed. He told White Eyes he was trying to establish who was with the baby when the baby was injured, and how the baby was injured (14:12-21). White Eyes acknowledged he was with Justine and the baby, that the baby had fallen asleep at approximately 8:30, had woken up at 9:30, was given a bottle and fell asleep. White Eyes said Justine left the bedroom and just he and the baby were in the bedroom from 9:30 until noon or 12:30 (15:2-11). White Eyes said the baby was fussy and he tried to calm the baby. He admitted tossing the baby in the air to play with her and to get her to quit crying (15:12-22). He admitted that once he missed her and her head hit his knee (16:22-17:4).

Kratz testified that at one point during the interview, Agent Purscell asked White Eyes, "If we ask you to take a polygraph, would you be able to pass it?" White Eyes responded, "Let me start over" (18:13-21). After starting over, White Eyes indicated that he was angry because Justine had left and he had to handle the baby, adding that the baby would not stop fussing. He moved the baby from side to side, and the baby's head was flopping from one side to the other (19:13-24). Kratz noted that White Eyes' demeanor changed as he started over, he became a little more calm, but was still concerned about the baby (20:4-7). Kratz estimated that the interview with White Eyes lasted approximately one hour (18:2-6).

Kratz testified that after White Eyes concluded his statement, Agent Purscell asked if he would have a problem giving a written statement. White Eyes said that he would not

and after being given a pen and paper, wrote out a statement (Ex. 2) (20:8-22). Kratz estimated it took White Eyes 20 minutes to write the statement (22:21-23:1), during which time no threats were made, nor was he told he was going to be charged with a crime (23:5-14). After the statement was signed by Agent Purscell, Kratz, Graybear, and White Eyes, the interview concluded and White Eyes was told he could go to his family (25:23-26:4).

Kratz testified he next saw White Eyes on May 1, 2007 in the tribal jail in Macy, Nebraska. Kratz had traveled to Macy with Agent Purscell to arrest White Eyes on a federal complaint. Kratz testified the May 1 interview occurred in the office of the Macy Chief of Police, Ed Tyndall, a 10 x 12 room with a desk and several chairs. Kratz, Purscell, Tyndall, and White Eyes were seated when Agent Purscell advised White Eyes of his rights, using FBI Form FB395 (Ex. 1) (28:8-24). White Eyes indicated he would waive his rights (30:11-19) and the form was signed by Agent Purscell, Chief Tyndall, Kratz, and White Eyes (29:4-6).

The interview began with Agent Purscell explaining that White Eyes would be transported to Omaha and what would happen to him there. Kratz noted White Eyes was calm, he did not seem surprised he was being arrested, and his demeanor did not change during the interview (31:1-19).

Bradley Purscell testified he is a Special Agent with the FBI, assigned to Sioux City, Iowa. On April 27, 2007 at approximately 5:00 P.M., he received a call that a juvenile victim was en route to Mercy Medical Center in Sioux City, Iowa. After arriving at the medical center he met Bentley Graybear, a Special Agent of the Bureau of Indian Affairs,

-4-

and two Sioux City, Iowa police officers. After speaking with the officers and a physician, he learned the injuries to the juvenile infant were consistent with the velocity of being dropped from a second-story window (59:7-12). This led him to be suspicious this could be a shaken baby case. The police officers also informed him that Marlon White Eyes, the father of the child, was a potential suspect (59:7-17).

Agent Purscell testified he determined he would first speak to Lois Smidt, the grandmother of the infant, and Justine Smidt, the mother of the infant. After conducting the Smidt interviews, he interviewed the defendant, Marlon White Eyes. Agent Purscell believed the interview took place in the same room as the Smidt interviews (62:17-19), in the presence of Kratz and Special Agent Graybear (62:20-21). After introducing himself as an FBI agent, he gathered biographical information and told White Eyes he was there to determine what had happened to the infant (63:3-10). Agent Purscell noted White Eyes' demeanor to be fine and that it did not change during the interview (63:18-22). At no time did White Eyes refuse to answer questions, nor did he ask for a lawyer (64:8-15). Purscell noted that during the interview he did not have a weapon visible and he did not view a weapon on either Kratz or Graybear. At no time during the interview did Purscell inform White Eyes he was going to be arrested, nor were any threats made (65:6-11).

Purscell testified White Eyes told him the baby and his mother came to the White Eyes residence the evening of April 25 and that around noon on April 26 the baby sustained its injuries (65:15-19). White Eyes stated the baby was initially fussy and he threw the baby up in the air and caught the baby. Upon catching the baby, the baby would go limp. Because the baby was crying and upset, White Eyes rocked the baby in a side-

to-side fashion approximately five times, during which the baby's head was flopping. He bounced the baby on his knee and shook her back-and-forth during which her head continued to flop. White Eyes could not recall the number of times he threw the baby in the air but approximated four to five times. It was on the second to last throw, when he threw the baby higher than normal, that the baby struck her head on his knee (66:2-15). Purscell asked White Eyes if he was willing to take an FBI polygraph examination if such an examination became necessary (66:19-25). White Eyes immediately responded that he would like to amend his statement. White Eyes then restarted his statement (67:1-5). Agent Purscell, however, specifically noted that it was during the first part of the interview that White Eyes first mentioned the baby hitting his knee (68:5-11). Agent Purscell noted that he challenged some of the things White Eyes said. Specifically he told White Eyes he did not believe the injuries were consistent with being thrown up in the air, falling short distances and striking White Eyes' knee (68:21-69:1).

Purscell testified that while providing the additional information, White Eyes said he was frustrated because the baby would not stop crying and he shook her in a side-to-side fashion before bouncing her on his knee, shook her back-and-forth and threw her in the air for approximately ten to fifteen minutes (69:5-12). Agent Purscell told White Eyes that he had investigated numerous cases of child abuse through 11½ years as an FBI agent and that the injuries were not consistent with what White Eyes was telling him (69:16-22). At the conclusion of the interview, Agent Purscell asked White Eyes if he would voluntarily submit a handwritten statement. White Eyes agreed and Agent Purscell wrote the preamble for him (70:10-20). Agent Purscell noted White Eyes' statement (Ex. 2) was

White Eyes' handwriting except for the opening phrase, "I, Marlon White Eyes, wish to make the following voluntary statement" (71:1-15).  While writing the statement, White Eyes did not express any hesitancy about writing the statement, object to writing the statement, or stop writing (72:3-9).  It took White Eyes about an hour and twenty minutes to write the statement after which it was signed by White Eyes, Agent Purscell, Mr. Kratz, and Special Investigator Graybear (72:25-73:4).  After the statement was signed, the interview was concluded, Agent Purscell and White Eyes shook hands and White Eyes left to go back with his family (75:2-7).

On April 5, 2007 Agent Purscell traveled to the Omaha Nation Law Enforcement Jail in Macy, Nebraska with a federal arrest warrant.  While at the jail, Agent Purscell, along with Mr. Kratz and Omaha Nation Law Enforcement Services Chief of Police Edward Tyndall, Jr., interviewed White Eyes in the chief's office.  Before the interview began, Agent Purscell informed White Eyes of the federal complaint and that he would be transporting White Eyes to Omaha.  He Mirandized White Eyes and asked him for an interview (76:24-77:5).  Agent Purscell observed that White Eyes did not seem surprised when arrested and he agreed to the interview (77:4-9).  Agent Purscell read White Eyes an FB395 FBI form, the Advice of Rights and Waiver of Rights (Ex. 1).  White Eyes agreed to the interview, stated he understood his rights, and signed the form (77:17-21).  Before White Eyes signed, Agent Purscell read each of the sentences to him and asked him if he understood.  White Eyes stated he did (78:11-17).  During the interview, White Eyes did not ask for a lawyer or that the interview stop (79:9-12).  At one point during the interview White Eyes stated that he had told Purscell everything at the hospital and that he wished

to conclude the interview; however, White Eyes immediately continued talking (79:13-18). Agent Purscell estimated the White Eyes interview lasted about thirty minutes (81:4-5).

On cross-examination Agent Purscell admitted that it would be fair to assume he was originally dispatched to the hospital to investigate a criminal offense (81:23-82:1). Agent Purscell explained that when he testified White Eyes' demeanor was "fine" he meant White Eyes was not nervous at all and was calm and sociable (83:12-16). Agent Purscell stated that it is the FBI policy not to videotape or audiotape interviews, but that it is his policy to ask for a written statement (84:10-24).

Agent Purscell testified that during his contact with White Eyes in Macy on May 1, 2007, that White Eyes looked like he expected him, because White Eyes did not appear surprised, agitated or nervous (84:25-85:7). Agent Purscell admitted he probably used the words "shaken baby syndrome" during the April 26, 2007 interview because he had to explain to White Eyes what that was (86:11-17).

Agent Purscell testified that when the Sioux City police talked to him, at the Sioux City hospital, they were aware of the injuries to the baby, but he did not recall being told that the baby's grandmother had told the Sioux City police anything about the baby's injuries (87:3-9).

## LEGAL ANALYSIS

"*Miranda* protections are triggered only when a defendant is both in custody and being interrogated. *United States v. Lawrence*, 952 F.2d 1034, 1036 (8th Cir.), *cert. denied*, 503 U.S. 1011 (1992). 'Interrogation' is 'express questioning,' or words or actions 'that the police should know are reasonably likely to elicit an incriminating response....'

*Rhode Island v. Innis*, 446 U.S. 291, 301 (1980); *Lawrence*, 952 F.2d at 1036...." *United States v. Hatten*, 68 F.3d 257, 261-62 (8th Cir. 1995), *cert. denied*, 516 U.S. 1150 (1996) (parallel citations omitted). A "custodial" interrogation involves "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *United States v. Chamberlain*, 163 F.3d 499, 502 (8th Cir. 1999).

"A *Miranda* warning must precede any custodial interrogation. A custodial interrogation involves questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *United States v. Chamberlain*, 163 F.3d at 502 (citing *Miranda v. Arizona*, 384 U.S. 436 (1966)). However, "[i]nterrogation in the *Miranda* context refers to express questioning and to words or conduct that officers should know is 'reasonably likely to elicit an incriminating response from the suspect.'" *United States v. Briones*, 390 F.3d 610, 612 (8th Cir. 2004), *cert. denied*, 545 U.S. 1122 (2005) (*quoting Rhode Island v. Innis*, 446 U.S. 291, 301 (1980)). "*Miranda* does not protect an accused from a spontaneous admission made under circumstances not induced by the investigating officers or during a conversation not initiated by the officers." *Butzin v. Wood*, 886 F.2d 1016, 1018 (8th Cir. 1989), *cert. denied*, 496 U.S. 909 (1990) (quotation omitted).

The touchstone for the admissibility of a defendant's statements is voluntariness. *Brown v. Mississippi*, 297 U.S. 278 (1936). The court must look to the totality of the circumstances in determining whether or not the defendant's statements were voluntarily

made. *Mincey v. Arizona*, 437 U.S. 385 (1978); *Colorado v. Connelly*, 479 U.S. 157 (1986); *Schneckloth v. Bustamonte*, 412 U.S. 218 (1973).

### A. Statement of April 26, 2007

The record shows that the April 26, 2007 statement was taken during the initial investigation at the hospital. At that time, the FBI conducted a series of interviews, interviewing anyone who had had contact with the baby to prepare a time line as to who was with the baby and when. White Eyes was advised that the baby's mother and grandmother had already been interviewed, and he agreed to cooperate in the investigation, participating in an interview and giving a written statement. He was not under arrest or detained by the police when he was first approached in the intensive care waiting room. He was free to leave at the conclusion of the interview and, in fact, did so.

Under the circumstances, the court finds that White Eyes was not in custody when he was interviewed on April 26, 2007. Since the statements were noncustodial, *Miranda* warnings were not required. The court finds there is no evidence of coercion or police misconduct with respect to obtaining the defendant's April 26, 2007 statements.

### B. Statement of May 1, 2007

As to the statements White Eyes made at the Macy police station on May 1, 2007, the court finds that White Eyes was advised of his constitutional rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966), and signed a written waiver of those rights. There is no evidence that White Eyes did not understand the advice of rights.

Even though White Eyes was advised of his *Miranda* rights, the court must examine the conduct of the law enforcement officials to determine whether or not there was an

overreaching by law enforcement officials amounting to coercive police activity. In determining whether a defendant made statements voluntarily, the court must determine if the accused was coerced or his will was overborne. *United States v. Wilson*, 787 F.2d 375, 380-81 (8th Cir.), *cert. denied*, 479 U.S. 857 & 865 (1986). Coercive police conduct will render a confession inadmissible. *Blackburn v. Alabama*, 361 U.S. 199 (1960). Coercive police pressure is a predicate to the finding that a confession is not voluntary and violates the accused's due process rights. *Connelly*, 479 U.S. at 167. However, any police questioning has coercive aspects to it simply by reason of the confrontation. The police officer is part of the law enforcement system that will cause a charge to be made against a suspect. The questioning by a police officer, while uncomfortable, is not coercive *per se*. *See Oregon v. Mathiason*, 429 U.S. 492, 495 (1977). The court must consider the totality of the circumstances, including the specific interrogation tactics employed, the details of the interrogation, and the characteristics of the accused. *Schneckloth*, 412 U.S. at 225-26.

"Trickery, deceit, even impersonation do not render a confession inadmissible, certainly in noncustodial situations and usually in custodial ones as well, unless government agents make threats or promises." *United States v. Kontny*, 238 F.3d 815, 817 (7th Cir.), cert. denied, 532 U.S. 1022 (2001) (citing *Frazier v. Cupp*, 394 U.S. 731, 739 (1969)); *see also Oregon v. Elstad*, 470 U.S. 298, 317 (1985) (citing *Frazier v. Cupp*: "[T]he Court has refused to find that a defendant who confesses, after being falsely told that his codefendant has turned State's evidence, does so involuntarily."); *see generally* William E. Ringel, Searches and Seizures, Arrests and Confessions § 25:8, SSAC § 25:8 (Westlaw, July 2007).

I find the testimony of Phillip Kratz and Agent Purscell to be credible, that White Eyes was read his *Miranda* warnings from an FBI Rights Advisory Form (Ex. 1), that White Eyes understood his rights, and agreed to speak with officers. My review of the circumstances surrounding the statement demonstrates that White Eyes' will was not overborne.

## RECOMMENDATION

In summary, the court finds that the defendant was not in custody on April 26, 2007 and voluntarily waived his *Miranda* rights before giving his statement on May 1, 2007. There is no evidence of coercive police activity. For these reasons,

**IT IS RECOMMENDED** to **Judge Laurie Smith Camp** that the defendant's Motion to Suppress (#25) be denied.

Pursuant to NECrimR 57.3, a party may object to this Report and Recommendation by filing a "Statement of Objection to Magistrate Judge's Recommendation" within ten (10) days after being served with the recommendation. The statement of objection shall specify those portions of the recommendation to which the party objects and the basis of the objection. The objecting party shall file contemporaneously with the statement of objection a brief setting forth the party's arguments that the magistrate judge's recommendation should be reviewed *de novo* and a different disposition made.

**DATED October 24, 2007.**

> BY THE COURT:
>
> s/ F.A. Gossett
> **United States Magistrate Judge**